**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 21CR156 (KAD) |
| v. | : | |
| | | |
| DAYQUAIN SINISTERRA | : | July 25, 2021 |

## MOTION AND INCORPORATED MEMORANDUM TO COMPEL DISCOVERY

The defendant, Dayquain Sinisterra, by and through undersigned counsel,

hereby provides the following background information in support of this Motion:

1. My Avon, CT office received a call on July 19, 2022, from Stephanie Dubuc, who

    identified herself as an FBI Special Agent.

2. Special Agent Dubuc asked to speak to Attorney Magdalena Narozniak, who is

    assisting me in this case, even though I am lead counsel.

3. My paralegal asked what the call was about, and Special Agent Dubuc initially

    said, "a case".  When prompted again she said a "federal case".  I then told my

    assistant to tell Special Agent Dubuc that if she did not say which case we would

    end the phone call as I am involved in trial prep for a complex federal trial that

    begins August 2, 2022, in Oklahoma City, Oklahoma. Special Agent Dubuc then

    said it was about the above captioned client.

4. Undersigned counsel answered the call.  Special Agent Dubuc initially told me

    she had asked for "Magda" but began talking to me after I made it clear I am also

    Mr. Siniterras lawyer, and "Magda" identified herself as she was in the room with

    me.  No one else identified themselves as participants on this call with Special

    Agent Dubuc.

5. Special Agent Dubuc then asked me if I knew a person, that person being one of my experts in this case.  When I said yes, she asked me at least two if not three times in which capacity.  This obviously raised my suspicions, so I began peppering her with questions about why she was asking the question.

6. Her response was that he is "under investigation" for something "unethical".  I continued questioning her about specifics; to include whether or not this is a background request about an investigation against him for some other matter or was it related to this case.  It was apparent she was hesitant to answer and paused several times as if she was distracted by something or someone.  She finally told me the investigation was directly related to this case but would not say in which way or which ethical rule he might have broken.

7. I could sense her discomfort so I directly asked her to tell me anything she can or was willing too.  Special Agent Dubuc then apologized and said she would check with the "AUSA" and get back to me in "two minutes".

8. Counsel did not expect to receive a return call and did not.  Therefore, I called the U.S. Attorney's office.  Unlike the Government I tried the lead AUSA first. When he was not available, I called Attorney John Pierpont.  I explained the situation to him and asked him what the call was about.  He was a little surprised as Attorney Pierpont informed me that he assumed I had already spoken to Attorney Natasha Freismuth as she was on the call with Special Agent Dubuc. He said this at least one other time when I told him I had no knowledge of her being on the call. I was placed on hold.

9.  Both Attorneys Freismuth and Pierpont then got on a conference call with me. They informed me that I would not be told what this was about as there were a few things they needed to look into first, but that I would be told the next day once this was done.  I pressed the issue and then was told by Attorney Pierpont that I had gone a long way towards clearing this up by confirming that my expert was, indeed, my expert.

10. Therefore, I called my expert and told my staff to investigate the only logical thing that could have occurred; that is, did we inadvertently find one of their confidential or cooperating witnesses?  Logically, we began contacting all of the persons my expert spoke to in an attempt to question them about being a confidential witness or informant who called law enforcement about what they took to be a threat.  So far, that has generated no results or leads.

11. The next day, July 20, 2022, came and I was finally called by the Government in the afternoon towards the end of the day.  On the call were all three AUSA's with an appearance in this matter.  Attorney Stone had been occupied with another matter and, while present on the phone, most of the factual discussions occurred with Attorneys Pierpont and Freismuth.  It was obvious Attorney Stone was unaware of what had been going on.  Some aspects of that call are troubling and not just the continued refusal to provide more than a morsel of more information.

12. The call began with Attorney Pierpont telling me had been mistaken when he told me his colleague was on the aforementioned call between myself and Special Agent Dubuc.  I question the veracity of this representation as it was not mentioned the afternoon before when I spoke with Attorneys Pierpont and

Freismuth. When I relayed the substance of the call between myself and Special Agent Dubuc to Attorney Stone, I was interrupted by Attorney Freismuth claiming I was lying.  I asked Attorney Freismuth how she knew that if she was not on the call. She replied, "I mean I don't know because I wasn't on the call".  Specifically, she was referring to my representation that Special Agent Dubuc told me my expert was under investigation.  As for the substance of that representation, my conversation with Miss Dubuc was via speakerphone with two witnesses in my office.

13. Additionally, when I pressed the Government on why they contacted my associate when they all know who I am and have dealt with me on this case, Attorney Freismuth claimed it was because Attorney Narozniak appears first on the list of attorneys in the Docket for this case.  I informed her that I and my co-counsel appear before her in the docket and AUSA Freismuth told me that was not true. When I informed her that I am looking at the ECF docket and I appear before Attorney Narozniak, Attorney Freismuth told me that she had been looking at it in her car and that the mobile app shows counsel in alphabetical order. Thus, I pointed out my name starts with "B".  I also stated that, even if you are trying to fit that into an order on a first name basis, the letter "J" comes before "M".

14. Miss Freismuth then claimed that Attorney Narozniak was contacted because the investigation is being conducted by the FBI and the agent does the investigating; thus, it was her decision to call Attorney Narozniak, but the Government was sure it was not for a nefarious purpose.  Counsel informed her that I knew she

was not telling me the truth.  Attorney Freismuth then admitted that she was the one who told Special Agent Dubuc to call about this matter and to call Attorney Narozniak but that she had no intention to circumvent me.  Rather, she told me it was just a coincidence.

15. After giving up in my efforts to get a definitive answer on the alphabetical order claim, I inquired as to what this "investigation" is about.  AUSA Pierpont informed me that a "girlfriend" of a confidential witness or informant had contacted them to tell them that my expert had "threatened" her boyfriend on behalf of Mr. Sinisterra and warned him not to testify.  My response was that such an accusation is ridiculous.  I asked "who and what threat" and they refused to answer or provide the information.  Needless to say, this call which, based on Attorney Pierpont's representation the afternoon before was not the call clearing this whole matter up that I was expecting. It should be noted that this call was also on speakerphone witnessed by two people, one an attorney in this office.

16. I ended the conversation by demanding an email or letter clearing my expert stating that he was not under investigation so he can get back to work.  It should be noted that he travelled to Pennsylvania to interview mitigation witnesses and immediately left without conducting the interviews based on these frivolous accusations by an anonymous person who, if it is about a confidential witness, is not credible; or certainly not as credible as my expert who has an excellent reputation.  It should be noted that one justification for having an FBI agent call me was that they had no idea who the person who allegedly made this threat was; in other words, they never heard of him or her.  I cannot say that is not true

like I can some of the misrepresentations described above, but it should be noted that this expert has been a mitigation expert on now seven (7) cases in this District; including a Mr. Stanley, a defendant in _United States v. Scott_, 14CR81, District of Connecticut.

17. The Government refused to provide this letter or email clearing my expert even after I pointed to the waste of Government resources incurred by the failed Pennsylvania trip and other wasted resources going forward, not the least of which will be the large quantity of hours chasing ghosts by me and my team, dealing with this Motion and the research connected to same and will be paid to deal with this going forward. Sadly, that letter or even an email would have ended the matter without court involvement or having to make a record of these events. Counsel understands mistakes are made and as long as rectified, I am a reasonable person.  But instead of doing the right thing, the Government decides to double down on interfering with my representation and telling tales that damage their own credibility.

18. Thus, I sent the letter attached as Exhibit 1 to this Motion.  They responded with the letter attached at Exhibit 2 to this motion.

19. As can be seen from Exhibit 2, the Government now claims that this direct threat to a girlfriend of a confidential witness is now a "perceived" threat to a "relation" of a "disclosed witness". I have not received a witness list, so I requested the Government tell me what they meant by "relation" and "disclosed witness", as well as the disclosed witness's name.  I received no response; not even a refusal to respond.

20. The Government also claims I told them my expert, who is a mitigation expert, was contacting witnesses in this case. While partially correct, it is misleading.  I represented he was contacting mitigation witnesses in this case and any contact with a fact witness, confidential or not, is coincidental.

21. Additionally, contrary to what I had been told on July 19th, 2022; the Government now represents this investigation is in its "infancy" and is "ongoing".  See Exhibit 2. They also note that I confirmed that my mitigator had been contacting witnesses in this case without my clarification that they were mitigation witnesses.  More troubling is that this is consistent with their underhanded and deliberate attempt to avoid speaking to undersigned counsel in order to obtain this information.

## LAW AND ARGUMENT

### a.  Rule 16 Requirements.

Rule 16 requires the government to produce to the defense three categories of documents: (i) items **material** to preparing the defense; (ii) items the government intends to use in its case-in-chief at trial; and (iii) items obtained from or belonging to the defendant.  (Emphasis added).  The key word there is "material" and not just "exculpatory".  Additionally, the Advisory Committee's notes to Rule 16 of the Federal Rules of Criminal Procedure state the philosophy behind the criminal discovery rules:

"[B]road discovery contributes to the fair and efficient administration of criminal justice by providing the defendant with enough information to make an informed decision as to plea; by minimizing the undesirable effect of surprise at the trial; and by otherwise contributing to an accurate determination of the issue of guilt or innocence."

The Advisory Committee notes to the 1974 amendment to Rule 16 stated that the "rule is intended to prescribe the minimum amount of discovery to which the parties are entitled.  It is not intended to limit the judge's discretion to order broader discovery in appropriate cases."  See also *United States v. Howell*, 231 F.3d 615, 625-26 (9th Cir. 2000).

"The Second Circuit has recognized a district court's inherent authority to regulate the nature and timing of discovery."; *United States v. Cannone*, 528 F.2d 296, 298 (2d Cir.1975). The government has an "affirmative duty to resolve doubtful questions in favor of disclosure," and "if the sword of Damocles is hanging over the head of one of the two parties, it is hanging over the head of the [government]." *United States v. Blackley*, 986 F.Supp. 600, 607 (D.D.C.1997).

Evidence is material to the preparation of a defense within Rule 16 if "'it could be used to counter the government's case or to bolster a defense,'" *United States v. Reddy*, 190 F. Supp. 2d 558, 572 (S.D.N.Y. 2002), whether or not the prosecution intends to offer the evidence at trial, *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993). The Rule "is not limited to evidence that is favorable or helpful to the defense and does not immunize inculpatory evidence from disclosure. Inculpatory evidence, after all, is just as likely to assist in the preparation of the defendant's defense' as exculpatory evidence" and "is just as important to the preparation of a defense to know its potential pitfalls as to know its strengths." *United States v. Safavian*, 233 F.R.D. 12, 15 (D.D.C. 2005), quoting from *United States v. Marshall*, 132 F.3d 63, 67 (D.C. Cir. 1998).

**b.** _Brady/Giglio_ **materials.**

The Supreme Court held in _Brady v. Maryland_, 373 U.S. 83 (1963) "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." _Id_. at 87. The disclosure duty applies to impeachment evidence as well as exculpatory evidence. _Giglio v. United States_, 405 U.S. at 154; _United States v. Coppa_, 267 F.3d 132, 139 (2d Cir.2001). Also, _Brady_ is not limited to just admissible evidence. "The objectives of fairness to the defendant, as well as the legal system's objective of convicting the guilty rather than the innocent, require that the prosecution make the defense aware of material information potentially leading to admissible evidence favorable to the defense." _United States v. Rodriguez_, 496 F.3d 221, 226 (2d Cir. 2007). See also _United States v. Gil_, 297 F.3d 93 (2d Cir.2002).

The duty to disclose derives from "the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." _Berger v. United States_, 295 U.S. 78, 88 (1935).

The District of Connecticut Standing Order on Discovery, as amended on May 24, 2017, requires prosecutors to disclose _Brady/Giglio_ material within fourteen (14) days of arraignment. While this timing may not be "constitutionally compelled," the

9

Standing Order's requirements are "based on the Court's inherent power to manage its

docket and provide for the orderly and timely disposition of cases." *United States v.*

*Jacobs*, 650 F. Supp. 2d 160, 165 (D. Conn. 2009) (Haight, J.), quoting from *United*

*States v. Perez*, 222 F.Supp.2d 164, 171 (D.Conn.2002) (Arterton, J.).

### c.  Policy of the U.S. Attorney's Office.

The United States Attorney's Office for the District of Connecticut (USAO) has a

detailed written policy to govern prosecutor's discovery decisions, Last Known

Amended Version dated October 15, 2010. [1]  See Exhibit 3. The policy provides in

pertinent part:

1.   Case agents should not have substantive communication with witnesses via

     email; Exhibit 3 at 6 (last para.);

2.  Prosecutors must obtain and review any emails between agents and

    witnesses; *id.*;

3.  Prosecutors must ensure that after "any meeting with a witness, including, but

    not limited to, when preparing for grand jury, trial or any other hearing, the

    attending agent … prepares a report of interview that memorializes any newly

    disclosed, inconsistent or exculpatory information obtained during such

    meeting," or, "[i]f a report will not be prepared in time to make a timely

    disclosure of the new information to enable the defense to utilize the

_____

[1] See https://www.justice.gov/sites/default/files/usao/pages/attachments/
2015/04/01/ct_discovery_policy.pdf (last accessed on July 25, 2022).

information to prepare for trial, then Assistants need to provide the

information to defense counsel by letter or email message;" *id*. at 11;

4. Prosecutors must turn over "information that is ***inconsistent*** with any element

of any crime charged against the defendant or that establishes a recognized

affirmative defense, ***regardless of whether the prosecutor believes such***

***information will make the difference between conviction and acquittal;"***

*id*. at 7, ¶ 1 (emphasis in original);

5. Prosecutors disclose "information that either casts a substantial doubt upon

the accuracy of any evidence – including but not limited to witness testimony

– the prosecutor intends to rely on to prove an element of any crime charged,

or might have a significant bearing on the admissibility of prosecution

evidence;" *id*.;

6. When interviewing witnesses, prosecutors must focus on obtaining accurate

information and "not thinking of ways to make it difficult for defense counsel to

cross-examine, e.g., deciding not to take notes or not to have a report

prepared to prevent [a prosecution] witness from being impeached by

defense counsel;" *id*. at 10, ¶ (g)(1);

7. When interviewing witnesses, a prosecutor must ensure that an agent is

present; *id*. at 11, ¶ (g)(3);

8. Prosecutors must "disclose memoranda of interviews (FBI 302s, DEA 6s, IRA

ROIs, etc.) of testifying witnesses; *id*. at 8 (2nd full para.);

9. Prosecutors should designate an agent to be the primary notetaker at each

witness interview, who "should be directed to create a report of that interview

11

in a timely manner – that is, shortly after the interview takes place;" *id*. at 12, ¶

(h)(1); and,

10. Prosecutors must disclose interviews of non-testifying witnesses which

contain exculpatory or impeachment evidence; *id*. (4th full para.).

**d. The Court should order the Government to disclose the nature and details of its investigation of the defense's expert.**

To obtain discovery, Mr. Sinisterra must make a prima facie showing that

*Brady/Giglio*/discovery violations occurred. See *United States v. Maniktala*, 934 F.2d 25,

28 (2d Cir.1991) (citing *United States v. Buckley*, 586 F.2d 498, 506 (5th Cir.1978), cert.

denied, 440 U.S. 982 (1979)); *United States v. McGuinness*, 764 F.Supp. 888, 894

(S.D.N.Y.1991).

Illustrative (but not exhaustive) examples of discovery, *Brady*, *Giglio*, and Jencks

Act[2] violations are as follows:

1.  Failing to disclose any FBI 302 or investigative reports in connection with this

    disclosure.

2.  Failing to disclose any statements (either written, oral or otherwise) in

    connection with this matter.

3.  Failing to disclose the name of the person who "perceived" or received an

    actual threat.

4.  Failing to disclose the nature of this threat.

5.  Failing to disclose the name of the witness who was allegedly threatened.

---

[2] [18 U.S.C. § 3500]

Illustrative (but not exhaustive) example of troubling conduct on behalf of the Government are as follows:

1.  The use of an FBI agent to contact my office in a manner designed to avoid speaking to me.  Prosecutors needing or requesting information from me always call or email my office.  Professional ones who have no intent to cause interference in my representation do not do things in the manner done here.

2.  A prosecutor initially claiming not once, but repeatedly, that the FBI Special Agent only contacted my associate because all counsel are listed in alphabetical order.  After being presented with proof they are not alphabetically listed, this same prosecutor than claimed they are in alphabetical order if one uses a mobile device to access ECF.  Finally, when the impossibility of this explanation was pointed out, this same prosecutor blamed the FBI agent, claiming she was the "investigator" and did this on her own; but that nothing was intended by calling my associate.  When counsel expressed disbelief using strong language, this prosecutor then admitted that she had instructed the agent to call Attorney Narozniak but asserted that asking her to call my associate was not an attempt to circumvent lead or learned counsel.

3.  The FBI Special Agent dispatched to call my associate had to be asked three times to identify which case she needed to discuss.

4.  There is direct evidence and circumstantial evidence a prosecutor was on the phone listening to my conversation with the FBI agent.

5. The shifting and inconsistent nature of their statements about this "investigation" is worrisome.  This includes indicating this issue would most likely be cleared up as I confirmed my expert was indeed working for me and not claiming this investigation is in its "infancy". Initially claiming a witness was threatened but now qualifying it as a "perceived" treat. Claiming this communication was allegedly made to the "girlfriend" of an undisclosed witness but now claiming it was a "relation" of a "disclosed witness".

6. The Government is wasting their own valuable resources and counsel's resources in this frivolous "investigation."  For example, a quick Google search would have revealed who this individual was in one second.  Thus, there was no need for their amateur 007 act in contacting my office. Everyone who knows my expert can speak to his impeccable character and professionalism.  Any competent investigation would show that as well.  If they really do not have better use of their investigative resources, there is a laptop and diary that needs some work in Delaware as well as claims by employees at Federal Correctional Institute Dublin that Asbestos contamination has been covered up and witnesses are being threatened by their superiors.  There is also the death of U.S. Army veteran Anthony Childs under questionable circumstances in Shreveport, Louisiana that was left to ill equipped state authorities.[3]

---

[3] See https://www.thedailybeast.com/shreveport-louisiana-cops-ran-wild-under-trump-will-biden-send-in-the-feds (last accessed on July 25, 2022).

This conduct and failure to disclose leaves the following questions that concern

counsel and should concern the Court:

1.  Is undersigned counsel a subject of any "investigation" that could justify the

    need to use tactics that are more in line with those conducted by the fictional

    counter-intel agency CONTROL than the FBI?  Contacting my office in this

    fashion as well as a prosecutor being on the line during a call with Special

    Agent Dubuc and undersigned without identifying herself raises this issue.

2.  How long will this interference with my representation continue?

3.  What is the actual nature of this threat?

4.  Were their own local policies followed in terms of any and all statements

    taken, or persons interviewed?

5.  Who made this complaint and who either was or perceived he/she was being

    threatened?

6.  What do they mean exactly by stating this "investigation" is in its infancy?

7.  Does this conduct not just interfere, does it unlawfully interfere with my

    representation?

Government misconduct which interferes with the right to obtain witness

testimony may take the form of threats of prosecution or other intimidating conduct.

United States v. Pinto, 850 F.2d 927, 932 (2d Cir.1988).  Clearly their conduct is

intimidating as well as a threat of prosecution against one my critical witnesses.  This

witness is a mitigation expert to lessen the chances of a death penalty being imposed.

It is obvious that, no matter one's position on the death penalty, this is the most serious

of cases as the life of a human being at the hands of the Government is involved.

Defendants are at the very least entitled to a tolerably fair trial.  Their conduct makes the trial process intolerably unfair.

To the extent the Government may have an interest in proceeding in this fashion, it cannot be outweighed by their attempt to kill Mr. Sinisterra.  One struggles to think of a reason to attempt to avoid undersigned counsel, eavesdrop on a call with counsel and then attempt to deny it with the most ridiculous and shifting half-truths. As those of us without a license to lie that law enforcement possesses say, "A half-truth is the most cowardly of lies." — Mark Twain.  One would have to have the IQ of a philodendron to believe the Government's explanations to counsel during and about our phone calls.

This request for information is mandated by their duty to disclose material evidence, which includes inculpatory evidence that can be used on cross examination or to impeach a witness; or even to measure the strength of one's own defense.  It is logical that this complaint of a "actual" or "perceived" threat that never occurred will call into doubt the testimony of that witness or anyone that witness states was threatened.

Thus, we request the following be Ordered produced by the Government:

1.   All FBI 302 or other law enforcement reports prepared in connection with this matter.

2.  All statements be they written, oral or otherwise.

3.  The identity of the person threatened, the one making the complaint unless they are one in the same, as well as the nature of the complaint in detail.

4.  Disclose all other persons on or affiliated with the defense team the Government has decided to investigate in connection with this case and the reasons for same.

WHEREFORE, as this conduct seriously impacts the defenses representation in this case, the defendant respectfully requests the Court Compel the Government to respond to these requests.

THE DEFENDANT – DAYQUAIN SINISTERRA

*/s/J. Patten Brown, III*

J. PATTEN BROWN, III, ESQ.

Law Offices of Pat Brown
43 W Main St
Avon, CT 06001
Tel. 860-321-7722
Fax: 860-404-2568
Email: paralegal@patbrownlaw.com
NY Reg. No. 4607891
Ct Fed Bar No. ct27633
TN BPR No. 021970
La. Bar Roll No. 21503

## CERTIFICATION

I hereby certify that on this 25th day of July, 2022, a copy of the foregoing Motion to Compel was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicted on the Notice of Electronic Filing. Parties may access this filing through the Courts CM/ECF System.

/s/ *J. Patten Brown, III*
J. PATTEN BROWN, III