## G.    DISCOVERY

In *Berger v. United States*, 295 U.S. 78, 88 (1935), the Supreme Court explained that "[t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." In performing our responsibility to ensure that justice shall be done, it is of paramount importance that Assistant U.S. Attorneys seek to ensure that criminal defendants receive the rights afforded them under our Constitution, including their Sixth Amendment right to a fair trial. One way that Assistants ensure a defendant's right to a fair trial is by providing a defendant and his or her counsel with discovery. The following Office policies are designed to help Assistants meet their responsibilities to provide discovery in a timely and complete manner. That being said, no Assistant should ever lose sight of our obligations to ensure that justice shall be done. Thus, if an Assistant believes that adhering to the policies set forth herein would in any way undermine our obligations to ensure a just result, the Assistant should consult with his or her supervisor to ensure that a defendant receives a fair and just prosecution.

Shortly after a defendant is arraigned, we are obligated to make disclosures to the defense. The requirements in this District, imposed by the court per the Standing Order on Pre-trial Discovery, as well as the U.S.A.M. §§ 9-5.001 (policy regarding disclosure of exculpatory and impeachment information) and 9-5.100 (policy regarding the disclosure to prosecutors of potential impeachment information concerning law enforcement agency witnesses - "*Giglio* policy"), go beyond those imposed by the Constitution, federal statute or federal rule. Assistants, in meeting their discovery obligations in a given case, must be familiar with the Standing Order on Pre-Trial Discovery, Federal Rules of Criminal Procedure 16 and 26.2, 18 U.S.C. § 3500 (the *Jencks* Act), *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), U.S.A.M. §§ 9-5.001 and 9-5.100, and other relevant case law. By following the approach set out in this chapter, Assistants will satisfy their discovery obligations.

In this District, we interpret *Brady* and *Giglio* broadly. If an Assistant has any doubt whether a piece of evidence is exculpatory, the Assistant should consult with a supervisor to determine whether the evidence should be disclosed. If no clear answer exists, the Assistant should consider: (a) requesting the court to decide; or (b) erring on the side of caution and make disclosure of the evidence. Similarly, non-exculpatory neutral evidence, such as the absence of fingerprints on a gun, should be disclosed as well. Evidence may be covered by *Brady* and *Giglio* even if it would not be admissible at trial if it would have led the defense to admissible evidence, or could have been used on cross-examination. If an Assistant waits until trial to disclose *Brady* or *Giglio* material and the defense argues that they do not have sufficient time to make reasonable use of the evidence – and they will make such an argument — then that Assistant has created a major issue for the case.

In general, this Office turns material over to the defense before most applicable time limits unless there is good reason not to (such as endangering the lives of witnesses, informants, etc.). In this section, we will discuss the source of our legal obligations to make disclosures to the defense, the discovery obligations of the defense, and miscellaneous issues that often arise during discovery. A sample discovery letter is available on the S: drive and must be used to document the government's disclosures.

The policies provided here are only for internal Office guidance. They are not intended to, do not, and may not be relied upon to create any rights (substantive or procedural), privileges, or benefits enforceable at law by any party in any matter civil or criminal. Nor are any limitations hereby placed on otherwise lawful litigative prerogatives of the Office. Moreover, this guidance is subject to legal precedent, court orders, and local rules. *See United States v. Caceres*, 440 U.S. 741 (1979).

## 1. Government's Obligations

### a. District's Standing Order

Appended to the Local Rules is the Standing Order on Pre-trial Discovery. It requires the government to disclose – within 14 days of arraignment – all material covered by Federal Rules of Criminal Procedure 16 and 12(b)(4), all material within the scope of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, including *Giglio v. United States*, 405 U.S. 150 (1972), prior bad acts evidence under Fed. R. Evid. 404(b), and a witness list, including names and addresses for each prospective government witness.

Both the Standing Order and the federal rules provide for application for a protective order if the government has cause for deferral of disclosure. *See* Standing Order at (F); Fed. R. Crim. P. 16(d). Applications for protective orders can be filed *ex parte*. In any case where witness safety is an issue, we routinely seek a protective order from the court, deferring disclosure of information that would identify certain witnesses until shortly before or at the time of trial. It is Office policy to obtain protective orders as a matter of course concerning the disclosure and dissemination of *Jencks* material, grand jury transcripts, and investigative reports. That policy is discussed below.

It is common that additional evidence and additional witnesses come to light after initial discovery disclosures have been made. Our duty to disclose is a continuing one. The discovery letters we send to defense counsel should always note that we are providing evidence known to date but that additional information may be obtained and additional disclosures may be made.

### b. Federal Rule of Criminal Procedure 16

Rule 16(a) sets forth the government's basic discovery obligations, and much of the Standing Order mirrors the rule. Under Rule 16(a), the government is required to disclose

written or recorded statements of the defendant; the substance of any oral statements made by the defendant in response to interrogation by a known government agent; the defendant's criminal history; all documents or other tangible evidence the government plans to introduce in its case-in-chief or which are material to the defense; reports of physical, mental, or scientific examinations (such as handwriting analysis, drug analysis, fingerprint reports, etc.) to be introduced by the government in its case-in-chief or which are material to the defense; and expert witness disclosures and summaries. Rule 16 explicitly excludes from disclosure witness statements and internal reports written by government agents or attorneys in connection with the investigation or prosecution of the case.

Rule 16 makes the government's discovery obligations contingent upon a defendant's request. In this District, however, the Standing Order requires disclosure without a request by the defense, and defense counsel who practice regularly in this District typically do not make a general request for discovery.

### c.    Federal Rule of Criminal Procedure 12(b)(4)

Rule 12(b)(4) provides that the government may notify the defendant at arraignment or soon thereafter of its intention to use specific evidence at trial to afford the defendant the opportunity to move to suppress this evidence before trial. The Standing Order requires disclosure of such evidence – including, for example, evidence obtained by way of search warrant, wire tap, or witness identification – within 14 days of arraignment. It is in our interest to turn over such evidence promptly so that suppression litigation does not delay trial. If we provide the defense with this evidence pre-trial and they fail to file a motion to suppress it, the defendant is deemed to have waived the suppression issue. Fed. R. Crim. P. 12(b)(3) & (e). If we lose on a suppression motion pre-trial, the government can file an interlocutory appeal. But, if the court allows a defendant to raise a suppression motion at trial – perhaps because the government failed to turn over the evidence in a timely fashion – and suppresses the evidence, an interlocutory appeal may not be practically feasible.

Whenever a suppression issue is pending, an Assistant should press the court to decide it before jury selection to preserve the government's right to appeal. Under Rule 12(d), a court cannot defer ruling on a pre-trial motion if doing so adversely affects a party's appellate rights.

### d.    Exculpatory and Impeachment Information

The government has a constitutional obligation to provide a defendant with material exculpatory and impeachment evidence, and Department policy requires prosecutors to exceed those constitutional obligations.

### (1)    Prosecution Team

An Assistant, in preparing for trial, is obligated by Department policy –

> to seek all exculpatory and impeachment information from all
> members of the prosecution team. Members of the prosecution
> team include federal, state, and local law enforcement officers and
> other government officials participating in the investigation and
> prosecution of the criminal case against the defendant.

U.S.A.M. § 9-5.001. This duty to seek all exculpatory and impeachment information also extends to information prosecutors are required to disclose under the Standing Order of Pre-Trial Discovery, Federal Rules of Criminal Procedure 16 and 26.2, and the *Jencks* Act.

In most cases, "the prosecution team" will include the agents and law enforcement officers within the relevant district working on the case. In multi-district investigations, investigations that include both Assistants and prosecutors from a Department litigating component or other USAOs, and parallel criminal and civil proceedings, this definition will necessarily be adjusted to fit the circumstances. In addition, in complex cases that involve parallel proceedings with regulatory agencies (SEC, FDIC, EPA, etc.), or other noncriminal investigative or intelligence agencies, the Assistant should consider whether the relationship with the other agency is close enough to make it part of the prosecution team for discovery purposes.

Some factors to be considered in determining whether to review potentially discoverable information from another federal agency include:

- Whether the Assistant and the agency conducted a joint investigation or shared resources related to investigating the case;
- Whether the agency played an active role in the prosecution, including conducting arrests or searches, interviewing witnesses, developing prosecutorial strategy, participating in discussions of possible targets, or otherwise acting as part of the prosecution team;
- Whether the Assistant knows of and has access to discoverable information held by the agency;
- Whether the Assistant has obtained other information and/or evidence from the agency;
- The degree to which information gathered by the Assistant has been shared with the agency;
- Whether a member of an agency has been made a Special Assistant United States Attorney;
- The degree to which decisions have been made jointly regarding civil, criminal, or administrative charges; and
- The degree to which the interests of the parties in parallel proceedings diverge such that information gathered by one party is not relevant to the other party.

Many cases arise out of investigations conducted by multi-agency task forces or otherwise involving state law enforcement agencies. In such cases, Assistants should consider

(1) whether state or local agents are working on behalf of the Assistant or are under the prosecutor's control; (2) the extent to which state and federal governments are part of a team, are participating in a joint investigation, or are sharing resources; and (3) whether the Assistant has ready access to the evidence. Courts will generally evaluate the role of a state or local law enforcement agency on a case-by-case basis. Therefore, Assistants should make sure they understand the law in the Second Circuit and the Office's practice regarding discovery in cases in which a state or local agency participated in the investigation or on a task force that conducted the investigation. Assistants are encouraged to err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes. Carefully considered efforts to locate discoverable information are more likely to avoid future litigation over *Brady* and *Giglio* issues and avoid surprises at trial.

### (2)      Constitutional obligations: *Brady* and *Giglio*

*Brady v. Maryland* and its progeny require the government to disclose exculpatory evidence, *i.e.*, evidence that is "favorable to the accused," when such evidence is "material to guilt or punishment." *Giglio v. United States* and its progeny extend *Brady* to all material information that might be used to impeach a government witness, such as a plea agreement between the witness and the government, the witness' criminal record, payments to an informant who will testify, or a witness's prior inconsistent statements. In some instances *Giglio* information might include other things such as disciplinary records of a law enforcement witness. *Giglio* information for non-law enforcement witnesses may include, but is not limited to, the following:

- Statements or reports reflecting witness statement variations
- Prior inconsistent statements (possibly including inconsistent attorney proffers)
- Benefits provided to witnesses including:
  - Dropped or reduced charges
  - Immunity
  - Expectations of downward departures or motions for reduction of sentence
  - Assistance in a state or local criminal proceeding
  - Considerations regarding forfeiture of assets
  - Stays of deportation or other immigration status considerations
  - S-Visas
  - Monetary benefits
  - Non-prosecution agreements
  - Letters to other law enforcement officials (e.g. state prosecutors, parole boards) setting forth the extent of a witness's assistance or making substantive recommendations on the witness's behalf
  - Relocation assistance

- Consideration or benefits to culpable or at risk third-parties
- Other known conditions that could affect the witness's bias such as:
  - Animosity toward defendant
  - Animosity toward a group of which the defendant is a member or with which the defendant is affiliated
  - Relationship with victim
- Known but uncharged criminal conduct (that may provide an incentive to curry favor with a prosecutor)
- Prior acts under Fed.R.Evid. 608
- Prior convictions under Fed.R.Evid. 609
- Known substance abuse or mental health issues or other issues that could affect the witness's ability to perceive and recall events

Criminal discovery is much different from discovery in civil cases. The gist of *Brady* and *Giglio* is that, if the government has evidence that hurts its case, it *must* disclose that evidence to the defendant. As a prosecutor, it is not just about winning – it is about achieving justice, no matter how damaging the evidence may be to the government's case. Few things cause as much trouble for a prosecutor as failing to disclose exculpatory information. There is no "good faith" exception for a *Brady* violation.

The United States Supreme Court has held that the prosecutor bears a personal obligation to review the investigative files of all law enforcement agencies that participated in the investigation. The prosecutor will be deemed to have knowledge of material in the agencies' files. Thus, Assistants should be certain to review the agencies' files before indictment.

In addition, no later than within 14 days of arraignment, when complying with the Standing Order on Pre-trial Discovery, the Assistant must provide the *Giglio* Coordinator with a list of all potential law enforcement witnesses so that any *Giglio* material may be obtained from investigative agencies. (This issue is discussed in more detail below.)

When reviewing the agencies' files, particular care should be given to emails. Assistants should be sure to request agents' emails containing any substantive information relating to the case. These emails may or may not have to be disclosed depending on the content of the emails, but they must be obtained in order to review them for *Brady/Giglio* information and to determine whether they constitute *Jencks* material in the event the agent testifies at trial or other hearing at which prior statements are required to be produced. Although agents should not be engaging in email correspondence about substantive case information with witnesses, Assistants must also be mindful that if an agent does so, the Assistant must obtain and review those emails to determine if they need to be disclosed.

### (3)     <u>Expanded Department obligations</u>

The Department of Justice has adopted a policy that requires broader disclosure of exculpatory and impeachment information than otherwise mandated by *Brady* and *Giglio*. According to § 9-5.001(C) of the U.S. Attorney's Manual, prosecutors must also disclose "information that is *inconsistent* with any element of any crime charged against the defendant or that establishes a recognized affirmative defense, *regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal* of the defendant for a charged crime." (Emphasis added.) This disclosure obligation is considerably broader than the "materiality" standard adopted in *Brady* cases. Moreover, prosecutors must also disclose "information that either *casts a substantial doubt upon the accuracy* of any evidence – including but not limited to witness testimony – the prosecutor intends to rely on to prove an element of any crime charged, or *might have a significant bearing on the admissibility* of prosecution evidence. This information must be disclosed regardless of whether it is likely to make the difference between conviction and acquittal of the defendant for a charged crime." *Id.* (emphasis added). The U.S.A.M. policy makes it clear that these expanded disclosure requirements cover all "information," regardless of whether it would constitute "admissible evidence." *Id.* Furthermore, the U.S.A.M. policy provides that when several items viewed together have the effect outlined above, all of those items must be disclosed. *Id.*

### e.     <u>Informant Disclosure</u>

*Roviaro v. United States*, 353 U.S. 53 (1957) and its progeny do not create a "fixed rule" with respect to the disclosure of an informant's identity. Whether disclosure is required depends on the circumstances of each case including the nature of the crime charged, the possible defenses and the importance to the defense of the informer's potential testimony. As a general rule, the government does not have to disclose the identity of an informant unless it is reasonably likely the informer can give testimony necessary to determine guilt or innocence, i.e. the informer is a material witness or an eyewitness to the charged offense and there is "a reasonable probability that the informer's testimony is necessary to a fair determination of guilt or innocence." Weinstein's Federal Evidence § 510.07[5]; *see also United States v. SAA*, 859 F.2d 1067, 1072 (2d Cir. 1988).

If an informant is merely acting as a tipster, it is unlikely that his identity will need to be disclosed. For example, assume narcotics officers use a confidential informant to make a buy from a drug dealer at the dealer's home, and based upon the buy, the officers obtain a search warrant. They find drugs in the house, and the dealer is arrested and prosecuted on charges pertaining to the drugs discovered during the search. The government is not obligated to disclose the informant who made the buy that provided probable cause for the search. If the dealer is charged for the buy made by the informant, however, the government would have to disclose the presence of an informant, but not necessarily his/her identity, as the informant is an

eyewitness to the transaction at issue. This will enable the defense to seek the disclosure of the informant's identity if it is essential to his defense, an issue that will undoubtedly require the court to decide whether the informant's identity needs to be disclosed.

Obviously, disclosure of an informant may endanger the safety of that informant and circumvent investigations in which they are involved. For these reasons, we resist disclosure of government informants, and generally only make such disclosures when ordered by a court. When faced with the issue of whether to disclose the identity of an informer, make sure to consult your supervisor and the agents who procured the informer's information.

### f.     The *Jencks* Act (18 U.S.C. § 3500) and Fed. R. Crim. P. 26.2

The *Jencks* Act, 18 U.S.C. § 3500, requires the government to make "witness statements" available to the defense after the witness testifies on direct examination. (Rule 26.2 imposes the same requirement on the defense for all witnesses other than the defendant.) "Witness statements" include writings that the witness made, signed, or adopted; recordings of the witness; substantially verbatim written recordings by a person interviewing the witness; and grand jury transcripts of the witness' testimony. An agency report of an interview of a witness typically is not a "witness statement" – it is usually not substantially verbatim and has never been adopted by the witness. While judges and defense counsel often treat agents' interview reports as witness statements, we should resist such a characterization. Nevertheless, it is the policy of the Office to disclose memoranda of interviews (FBI 302s, DEA 6s, IRS ROIs, etc.) of testifying witnesses.

A court cannot order the government to disclose witness statements before the witness has testified at trial. *United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001). Nevertheless, it is the policy of this Office to disclose witness statements falling within the *Jencks* Act at least five days before the start of evidence in the typical case. In those instances where the identity of the witness is the subject of a protective order (per the Standing Order (F) and Fed. R. Crim. P. 16(d)), *Jencks* disclosure should be made 48 hours before the witness testifies, unless otherwise ordered by the court. In certain cases, particularly complex cases where there is no real threat to the safety of witnesses, an Assistant is encouraged to disclose witness statements much earlier.

Reports of interviews of non-testifying witnesses are generally not required to be disclosed. Exceptions to this general rule would be that the reports contain exculpatory or impeachment information that must be disclosed as a constitutional matter or pursuant to Department or our Office's discovery policy as set forth herein, the reports contain substantially verbatim statements of a trial witness, or the witness has adopted the statement of the non-testifying witness as his own. Assistants may wish to turn over memoranda of interviews and grand jury testimony of non-testifying witnesses absent countervailing considerations, such as, for example, the investigation is continuing or to prevent witness harassment. If agency reports

are disclosed, redact all conclusions and opinions of the agents writing the reports (unless the reports are turned over as *Jencks* statements of the agent-witness), all cross-references to other reports or cases (including NADDIS numbers and similar internal agency tracking information), and all identifying names, home addresses, social security numbers, dates of birth, etc. Further, we often move *in limine* to prevent defense counsel from impeaching a non-agent witness by referencing a law enforcement agency report that the witness did not adopt and may never have seen. *See* Sample Motion S: drive/Criminal Forms/in limine 302s as statements.wpd.

As discussed in more detail below, Assistants should seek a protective order in each and every case to prohibit the dissemination of *Jencks* material, grand jury transcripts, and agency reports to persons not involved in the defense of the case. At times, material we have turned over in discovery has been disclosed to members of the media or to others who have no involvement in the case. Such dissemination can be harmful to the government and injurious or dangerous to witnesses. To prevent such dissemination, Assistants should seek, *in every case,* a protective order that will prohibit disclosure of any and all *Jencks* material, grand jury transcripts, and agency reports to anyone outside the case. The standard protective order would allow defense counsel to receive the material and review it with persons directly involved in the defense of the case but would prohibit dissemination of copies to anyone, including the defendant. A form motion for protective order and a proposed order can be found on the S:drive. In many instances, defense counsel may consent to the protective order, especially as it may allow them earlier access to *Jencks* material. If they do not, the Assistant should move the court for the protective order and inform the court that, absent the requested prohibition against dissemination of witness-related material, *Jencks* disclosures will be made much closer in time to the trial. In all cases, Assistants should have defense counsel return the *Jencks* statements to the government at the end of the case.

If a witness statement contains exculpatory or impeachment information, it should be disclosed to defense counsel pursuant to the Standing Order. Our obligations under *Brady* and the Department's and our Office's policy regarding exculpatory and impeachment information prevail over the provision of the *Jencks* Act that allows us to defer disclosure of witness statements until after a witness testifies. However, if early disclosure of exculpatory or impeachment information would subject a witness to harassment or intimidation or threaten an ongoing investigation, the Assistant should make an *in camera* request of the court for a protective order to withhold disclosure for that reason until some other appropriate time. *See* Standing Order at (F). Obtaining a protective order is a two-part procedure. First, the Assistant must file a motion, seeking permission to submit a sealed *ex parte* affidavit. If the court grants that motion, the sealed *ex parte* affidavit of an agent is filed with a motion for protective order and a proposed order. Examples of these pleadings can be found in the Criminal Forms directory on the S: drive. The application to the court for a protective order should make clear that the government intends to delay disclosure of exculpatory or impeachment information that would identify a witness. So informing the court will also help to defend against a later claim of a

*Brady/Giglio* violation.

We often try cases in which consensual or non-consensual electronic surveillance results in the production of a tape recording. The agent should have the tape recording transcribed for use in the preparation of the case and, if necessary, translated into English in cases where the tape recordings involve languages other than English, preferably before the case is charged, although this is not always practicable. Before using the transcripts and translations at trial and before disclosing them to the defense, Assistants should check their accuracy. Rough drafts often are incomplete or inaccurate and not in an acceptable form for the jury. Assistants should use caution in disclosing draft transcripts to the defense. *See* Sample Discovery Letter (attachment for disclosing transcripts). If they are different from the final version, the defense may use the drafts in an attempt to preclude use of the more accurate version at trial or to otherwise attack the transcript.

> ### g. Witness Interviews and Preservation of Rough Notes by Assistants - Office Policies

In order to help Assistants to comply with their discovery obligations, the Office has adopted the following policies and best practices with respect to witness interviews and disclosure of rough notes.

> #### (1) When interviewing any witness, it is the policy of this Office to obtain accurate information from the witness.

This should be your primary focus and you should not be thinking of ways to make it difficult for defense counsel to cross-examine, e.g., deciding not to take notes or not to have a report prepared to prevent your witness from being impeached by defense counsel.

> #### (2) When interviewing a witness, an Assistant should make certain to have a procedure in place that will enable timely disclosures under the law and Department policy.

As noted above, each Assistant has an obligation to make disclosures after the filing of an indictment or information as governed by the new section in the U.S.A.M. § 9–5.001, which provides that the "government's disclosure will exceed its constitutional obligations." *Id.* ("This policy encourages prosecutors to err on the side of disclosure in close questions of materiality and identifies standards that favor greater disclosure in advance of trial through the production of exculpatory information that is inconsistent with any element of any charged crime and impeachment information that casts a substantial doubt upon either the accuracy of any evidence the government intends to rely on to prove an element of any charged crime or that might have a

significant bearing on the admissibility of prosecution evidence.").

It is the policy of the Office that following any meeting with a witness, including, but not limited to, when preparing for grand jury, trial or any other hearing, the attending agent will be required to prepare a report of interview that memorializes any newly disclosed, inconsistent or exculpatory information obtained during such meeting. Such information may need to be disclosed to the defense if the witness is to be called by the government as a witness at trial or if the information constitutes *Brady* or *Giglio* material as discussed in these policies. If a report will not be prepared in time to make a timely disclosure of the new information to enable the defense to utilize the information to prepare for trial, then Assistants need to provide the information to defense counsel by letter or email message.

Note that "the policy recognizes the need to safeguard witnesses from harassment, assault and intimidation and to make disclosure at a time and in a manner consistent with the needs of national security." Thus, an Assistant may seek a protective order to delay disclosure of witness information and statements. Bear in mind that the information will need to be provided at a time that will enable defense counsel to make use of the information at trial.

Note that your obligation to make *Brady*, *Giglio*, or Rule 404(b) disclosures is not contingent on the existence of notes or reports generated at witness interviews. The obligation to make the required disclosures exists even if the discoverable information was not memorialized in writing.

> **(3)** **When interviewing witnesses, it is the policy of this Office to have the case agent or other agent present to observe the interview at all times.**

Note that an Assistant meeting with the federal case agent, or a law enforcement officer that is acting as the case agent, may be the one exception to this policy.

> **(4)** **It is the policy of this Office to ensure that Assistants preserve the notes they generate at a witness interview.**

When notes are generated at a witness interview by Assistants, Assistants should preserve their notes. Federal agencies also have internal rules that require agents to preserve notes generated at witness interviews. Note that it is **not** the policy of this Office to produce in discovery the rough notes of agents or Assistants taken during interviews **when** a report or FBI 302 is generated regarding the interview. Be aware that a 2007 decision by Judge Droney indicates that the rough notes of an agent taken during the interview/proffer of a defendant are discoverable pursuant to <u>Fed. R. Crim. P. 16</u>, even if the notes have been reduced to a final report. <u>*United States v. Ferguson*, 478 F. Supp. 2d 220, 235-38 (D. Conn. 2007)</u>. An Assistant

should review his or her own notes (if any), and ensure that an agent reviews his or her own notes, to determine whether the notes contain discoverable information that has not been disclosed in the final report. If additional information needs to be disclosed after this review, the agent should generate a supplemental memorandum or report or the Assistant should provide the defense with a discovery letter.

In situations where no report or 302 is generated concerning a witness interview, a decision should be made on a case-by-case basis whether to produce agent notes in lieu of a report. In any event, if the agent's notes are not produced in discovery, an Assistant should never hesitate to disclose discoverable information contained in the agent notes to the defense through a letter, e-mail or other form of written disclosure.

Note that it is **not** the policy of this Office to produce in discovery a copy of the typed or handwritten notes generated by an Assistant at a witness interview. That being said, an Assistant should disclose discoverable information to the defense that the Assistant is aware of by requesting that an agent prepare a written report of the discoverable information or by sending a letter, email or other form of written disclosure to the defense.

        **h.**     <u>**Best Practices Regarding Witness Interviews, the Taking Of Notes During Witness Interviews, the Creation of Reports Regarding Witness Interviews and the Disclosure of Rough Notes Made by Agents and Assistants**</u>

1. At each witness interview conducted by an Assistant and agents, one person (an agent rather than an Assistant) should be designated as the primary note taker and that person should be directed to create a report of that interview in a timely manner – that is, shortly after the interview takes place.

2. Agents should write their reports based on their own notes and recollection. In particularly complex interviews, the Assistant and agents present may review a draft of the interview report to confirm its accuracy. If there is a disagreement as to what was said by the witness, every effort should be made to re-interview the witness on the disputed issue. If a disagreement arises as to what a witness said during an interview, then the Assistant must be aware that disclosure obligations may be triggered.

3. While an Assistant may choose not to take notes during a witness interview (or may choose to take only certain notes for the Assistant's own purposes rather than a verbatim recitation of what the witness said), an Assistant should not hesitate to record his or her mental impressions of the witness and the interview after the interview in a manner that protects the impressions as the attorney's work product. Such work product should be protected from disclosure. If the Assistant's notes memorialize exculpatory or impeachment information, the

Assistant should enlist the assistance of the agent to ensure that the discoverable information is disclosed to the defense, preferably via an agent report. Assistants should be aware that, if their notes are disclosed, defense counsel may seek to compel the Assistant to become a witness in the case.

4. When significant information is obtained from a witness during an interview, an Assistant should consider memorializing the significant information in a form consistent with Fed. R. Crim. P. 801(d)(1) (such as grand jury testimony or deposition). Statements made under oath in the grand jury will be admissible at trial for the truth, whereas other statements might not.

5. An agent may decide to write a narrative report of the interview or a report arranged by subject matter. Whatever type of report is created, the method used should not be chosen to smooth over inconsistencies or evolution in the witness's statement.

6. In situations where a witness is interviewed on multiple occasions, an Assistant should consider whether a more accurate record of these sessions can be accomplished by requesting that an agent prepare separate reports for each interview rather than a single, composite report. Whatever type of report is created, the method used should not be chosen to smooth over inconsistencies or evolution in the witness's statement. Care should be taken by the Assistant and the author of the report to ensure that exculpatory and impeachment information are recorded in the report. For example, if a witness withheld information during early interviews that was later revealed, that fact should be included in the report. Otherwise, there is a greater likelihood that the agent's notes from each session may need to be disclosed in response to a defense argument that they are entitled to know when the witness first disclosed certain information.

7. Be aware that if an agent refers to his rough notes while preparing for his testimony or testifying, his notes may be discoverable under Fed. R. Evid. 612.

8. It is recommended that a witness be permitted to review his or her sworn statements or grand jury testimony prior to testifying. You may decide to show or review the contents of an agent's report with a witness by discussing the information contained in the report. If the witness indicates that something in their sworn statement, grand jury testimony, or the report is not what they said or is not accurate, such discrepancy should be disclosed to defense counsel. Also, if the witness provides new information, the agent should memorialize the new information so the Assistant can determine what disclosure obligations may be triggered.

9. If a witness discloses information during an interview and then seeks to retract the information when testifying in the grand jury, the witness should generally be confronted on the record with the previous inconsistent statement. Such a confrontation may result in the witness acknowledging that the earlier statement is correct. In either event, the inconsistency will be

noted on the record and permit the disclosure of the inconsistency by disclosing the grand jury testimony of the witness as *Jencks* material, or exculpatory or impeachment information, prior to trial.

10. If a defense lawyer gives you a lawyer's hypothetical proffer, the information may need to be disclosed – for example, if the lawyer's client becomes a cooperator and the proffer is inconsistent with the client's testimony. A report should be created of the attorney proffer, which if practicable, will require an agent to be present for an attorney proffer and to take notes of the proffer. Exculpatory or impeachment information received during attorney proffers must disclosed.

11. If an Assistant determines that it is necessary to disclose the rough notes of agents or previous or current Assistants who handled a case to ensure that all discovery obligations have been complied with, the Assistant should do so.

12. When dealing with state law enforcement, an effort should be made to obtain the notes taken by state law enforcement officers, and they should be reviewed to determine if the notes contain exculpatory or impeachment information. If no reports are generated, the Assistant should consider turning over the notes of the state law enforcement officers in discovery.

### i. Discovery in Title III Cases

After a case has been charged that involved a wire tap, the government is obligated to disclose certain pertinent materials. First and foremost, we provide defense counsel with a CD containing the intercepted conversations. We emphasize that the conversations themselves are the evidence rather than any summary, description, or even transcription of the conversations we may provide. We should provide every call that has been intercepted. In the course of plea discussions, an Assistant may want to provide a defendant's attorney with a sampling of the most pertinent, inculpatory calls to facilitate reaching a resolution, but it should be stressed to the defense that the calls provided in such instances are a sampling only, and that the government may use other calls in the trial of the case. We also provide the defense with copies of the logs that track each intercepted call.

Often in wire tap cases, some of the defendants are detained pre-trial, and the issue has arisen about how to ensure that such defendants can review the intercepted conversations and confer with their counsel about this evidence during their preparation for trial. As discussed below, it is the policy of the Office to obtain a protective order limiting disclosure of Title III material to counsel and to designated personnel at custodial facilities. We have provided copies of the calls to prison counselors who then provide controlled access to the defendants housed in their facility. This practice allows defendants to have access while, at the same time, protecting this sensitive material from widespread dissemination within the prisons.

As transcripts, and in some cases translations, of the conversations are finalized, we disclose those to the defense as well. While the defense may ask for draft transcripts and translations to aid them in their trial preparation, providing draft transcripts and translations is risky, especially if the final versions differ in any significant way from the drafts. Assistants should consider including in the discovery letter a notice and certification with defense counsel that draft transcripts and draft translations are preliminary and are not in final form, that counsel understands that the government reserves all rights to prepare final transcripts and final translations to be provided to the jury as an aid to listening to the tape recordings at the time of trial, and that counsel will not raise any differences between the draft transcript and draft translations and the final transcript and final translation at trial whether in cross-examination, summation, or in any other way. A sample notice and certification appear as Attachment A to the sample discovery letter on the S: drive under "Criminal Forms."

In addition to material that relates directly to the intercepted conversations, we also provide the defense with copies of the final version of the application, affidavit, and order authorizing electronic surveillance and any and all extensions thereof, of pen register orders and pleadings, of pleadings and orders obtained pursuant to 18 U.S.C. § 2703, of sealing applications and orders, and of notices of inventory. If this material is provided to the defense on CD, care should be taken to make certain the version provided is the final one that was actually submitted to the court. Note that if the defendant does not have standing to challenge the electronic surveillance and you have an ongoing investigation that could be jeopardized by the disclosure of the application and affidavit authorizing the wire tap, you should consult with your supervisor to determine if disclosure of such information should be made at all, or whether a protective order limiting the disclosure of such materials to only defense counsel should be obtained.

We do not disclose to the defense the progress reports we submit to the court during the wire tap.

Before providing any of the above material to the defense, the Assistant should obtain, either on consent of counsel or otherwise, a protective order that prevents disclosure of wire tap material beyond defense counsel and counsel's affiliates. The order should direct counsel that copies of the Title III discovery provided cannot leave their custody or control, or the control of designated prison personnel who agree to give detained defendants controlled access. Defendants can have access only through their attorneys or counselors. Such an order will limit, to the extent possible, dissemination of sensitive Title III material and provide recourse for the government if such dissemination occurs. A sample motion and protective order can be found on the S: drive.

**j.** **Discovery Obligations in Matters**
**Involving or Implicating National Security**
**(NOTE APPENDIX)**

Although the discovery obligations set forth in this Chapter generally apply in the context of national security investigations and prosecutions as well, special complexities arise in that context. Accordingly, this discovery policy does not necessarily govern disclosure in cases involving terrorism and national security. For further guidance regarding discovery obligations in terrorism or national security matters, Assistants should consult the **APPENDIX** entitled "Discovery in National Security Cases and Cases involving National Security Information" and should contact the Chief of the Criminal Division, the Chief or Deputy Chief of the National Security and Major Crimes Unit and/or the ATAC Coordinator at the earliest possible juncture in an investigation to discuss these issues.

Because cases involving national security (including terrorism, espionage, counterintelligence, and export enforcement), can present unique and difficult criminal discovery issues, the Department of Justice has developed special guidance for those cases. For example, the January 4, 2010 memorandum from Deputy Attorney General David W. Ogden entitled *Guidance for Prosecutors Regarding Criminal Discovery* (the "Guidance Memo"), which encouraged prosecutors to "provide discovery broader and more comprehensive than the discovery obligations," Guidance Memo, p. 9, nevertheless recognized that, in several instances, providing discovery that is broader and more comprehensive than legally required may not be possible or appropriate in cases involving national security information.

The Guidance Memo made explicit note that "when considering providing discovery beyond that required by the discovery obligations or providing discovery sooner than required, prosecutors should always consider any appropriate countervailing concerns in the particular case, including . . . protecting national security interests . . . ." *Id.* at 9. In addition, in discussing how to meet discovery obligations regarding voluminous information obtained from third parties, the Guidance Memo suggested that prosecutors may want to consider providing defense access to the voluminous documents to avoid the possibility that a well-intentioned review process nonetheless fails to identify material discoverable evidence. *Id.* at 8-9. However, the Guidance Memo also noted that such broad disclosure may not be feasible in national security cases involving classified information. *Id.* at 9. Finally, the Guidance Memo recognized that the United States Attorneys' Manual provides that the timing of *Giglio* disclosures regarding witnesses may be affected by national security concerns. *Id.* at 10; *see also* USAM § 9-5.001. Because of the observations noted above, the Guidance Memo noted the Department's intention to issue additional guidance for national security cases. Guidance Memo, p. 3.

Subsequent guidance from the Department of Justice provided some general discussion of factors that prosecutors should consider in determining the scope and timing of disclosures in national security cases. In addition, a September 29, 2010 memorandum issued by Acting Deputy Attorney General Gary G. Grindler entitled *Policy and Procedures Regarding Discoverable Information in the Possession of the Intelligence Community or Military in*

*Criminal Investigations* (the "IC Memo") provided guidance with respect to the circumstances in which Assistants have a duty to search for discoverable information within the intelligence community and the steps to follow when that duty arises. Prosecutors should consult that memorandum and their supervisors regarding discovery obligations relating to classified or other sensitive national security information. As a general rule, however, in those cases where the prosecutor, after conferring with other members of the prosecution team, has a specific reason to believe that one or more elements of the Intelligence Community ("IC") possesses discoverable material, he or she should consult NSD regarding whether to request a prudential search of the pertinent IC element(s). All prudential search requests and other discovery requests of the IC must be coordinated through NSD.

Although discovery issues relating to classified information are most likely to arise in national security cases, they may also arise in a variety of other criminal cases, including narcotics cases, human trafficking cases, money laundering cases, and organized crime cases. In particular, it is important to determine whether the prosecutor, or another member of the prosecution team, has specific reason to believe that one or more elements of the IC possess discoverable material in the following kinds of criminal cases:

- Those targeting corrupt or fraudulent practices by middle or upper officials of a foreign government;

- Those involving alleged violations of the Arms Export Control Act or the International Emergency Economic Powers Act;

- Those involving trading with the enemy, international terrorism, or significant international narcotics trafficking, especially if they involve foreign government or military personnel;

- Other significant cases involving international suspects and targets; and

- Cases in which one or more targets are, or have previously been, associated with an intelligence agency.

For these cases, or for any other case in which the prosecutors, case agents, or supervisors making actual decisions on an investigation or case have a specific reason to believe that an element of the IC possesses discoverable material, the prosecutor should consult with NSD regarding whether to make through NSD a request that the pertinent IC element conduct a prudential search. If neither the prosecutor, nor any other member of the prosecution team, has a reason to believe that an element of the IC possesses discoverable material, then a prudential search generally is not necessary.

The principles and policies set forth in the **APPENDIX** to this manual incorporate and/or draw heavily upon the memoranda and guidance issued by the Department of Justice. However, because special complexities arise in the context of national security investigations and prosecutions, Assistants should nevertheless consider potential discovery obligations early and often in an investigation that has national security implications, and they should carefully evaluate their discovery obligations prior to filing charges. This evaluation should consider circuit and district precedent and include consultation with national security prosecutors within the USAO and in the National Security Division at Main Justice.

For assistance with discovery obligations in terrorism or national security matters, Assistants should contact the Chief of the Criminal Division, the Chief or Deputy Chief of the National Security and Major Crimes Unit and/or the ATAC Coordinator at the earliest possible juncture in an investigation to discuss these issues.

## 2.  Defense Obligations

The defense has discovery obligations as well, although they are much more limited than those imposed on the government. Once an Assistant has provided discovery to the defense, he or she should request reciprocal discovery. Our form discovery letter makes this request, but it is routinely ignored by defense counsel. If the defense has not provided discovery within the time frame set forth in the Standing Order, the Assistant should file a written motion for reciprocal discovery, and press the defense and the court for compliance. (A form reciprocal discovery motion can be found in the Criminal Forms directory on the S: drive.) The government will then have an argument to preclude the defendant's introduction of evidence that falls within the scope of the Standing Order and federal rules and was not disclosed before trial.

### a.  District's Standing Order

Under the Standing Order, the defendant is required to disclose the following within 14 days of the government's discovery disclosures: (1) whether the nature of the defense is entrapment, insanity, duress, or coercion, or acting under public authority at the time of the offense; (2) books, papers, tangible evidence in the defendant's possession, custody, or control that the defendant intends to introduce in his or her case-in-chief; (3) results or reports of physical or mental examinations or scientific tests the defendant will introduce in his or her case-in-chief or which were prepared by a defense witness who will testify; and (4) expert witness summaries, qualifications, and opinions. *See* Standing Order at (B).

If the defense calls a witness, other than the defendant, at any hearing in the case, they are required to turn over any witness statements they have that relate to the subject matter of the testimony. *See* Standing Order at (G).

### b.    Federal Rules of Criminal Procedure 16, 12.1 - 12.3, 26.2

Federal Rule of Criminal Procedure 16(b) sets forth the basic discovery obligations imposed on the defendant. The Standing Order mirrors this rule. Rule 16 does not require production of witness statements; any disclosure obligation in this regard is set forth in Rule 26.2, discussed below.

Rules 12.1, 12.2, and 12.3 require the defendant to give notice of certain types of defenses. Rule 12.1 requires the defendant to give written notice of any intended alibi defense. Before receiving such notice, the government must request it in writing, stating the time, date, and place of the alleged offense. The defendant's response is due within 14 days and must state specifically where the defendant was at the time of the offense and provide the names, addresses, and telephone numbers of all alibi witnesses. Once the government receives the alibi notice, it must disclose the witnesses it will call to rebut the alibi and to establish the defendant's presence at the scene of the crime. The disclosure obligations of the defendant and the government are continuing. The failure to comply with these notice provisions may lead to the exclusion of the non-disclosed witness. However, the court cannot prevent the defendant from testifying about the alibi even if the defense fails to comply.

Our standard discovery letter and our form reciprocal discovery motion request notice of any alibi defense.

Rule 12.2 requires the defendant to provide written notice of his intention to rely on the insanity defense. His failure to provide such notice precludes assertion of this defense. The defendant is also required to provide written notice of his intention to introduce expert evidence relating to mental disease or defect at either the trial or the penalty phase of the case. The rule provides for mental examinations of the defendant and contains provisions applicable in the prosecution of a capital case. Should an insanity or mental defect/disease defense be raised, the Assistant will need to be thoroughly familiar with the provisions of Rule 12.2.

Rule 12.3 pertains to a claim of public authority to engage in the charged criminal conduct, that is, the defendant claims that he was acting on behalf of a law enforcement or intelligence agency. The defendant is required to provide written notice of this defense under seal, and the government must respond in writing, either admitting or denying that the defendant exercised the public authority identified in his notice. The defendant is required to identify all witnesses in support of his defense, and the government must notify those witnesses it would call to oppose the defense.

Finally, Rule 26.2 imposes *Jencks* obligation on the defense, with the exception of statements of the defendant. Accordingly, after a defense witness other than the defendant has testified, the defendant is obligated to disclose any statements he or she has of the witness that

pertain to the subject matter of the testimony. A failure to produce witness statements within the custody or control of the defense will lead to the witness' testimony being struck. Fed. R. Crim. P. 26.2(e). Rule 26.2 applies not only to trial but to other proceedings as well, including suppression or detention hearings, sentencings and revocation hearings, and habeas proceedings. Particularly in cases where the defendant has retained a private investigator, it is likely that the defense may have witness statements, or at least notes of the investigator to which an Assistant can seek access or ask for an *in camera* review.

Assistants may want to condition early disclosure of *Jencks* material to disclosure by the defense of any statements they have in their possession or control.

### 3. Witness Issues

#### a. Cooperators/Cooperation Agreements/ Separation of Cooperators

An Assistant is obligated to disclose any information or evidence in the government's possession that undermines the credibility of a government witness. For cooperating witnesses, we must disclose any and all agreements with the witness (proffer, plea, cooperation, immunity agreement) and any benefits conferred on the witness (payments, forfeiture waivers, reductions in sentence, forgone prosecutions, immunity from prosecution, free telephone service, food, etc., conjugal or other extraordinary visits), as well as other impeachment evidence such as the witness' criminal record, any pending charges or investigations, prior inconsistent statements, acts of misconduct by the witness that would be admissible under Fed. R. Evid. 608(b), prior findings of incredibility, psychiatric or mental conditions, and evidence of bias (against the defense or toward the prosecution). If the witness had acted as a government informant on prior occasions, his prior service may constitute impeachment evidence that must be disclosed. *See In re Sealed Case*, 185 F.3d 887, 893-94 (D.C. Cir. 1999); *United States v. Malpeso*, 115 F.3d 155 (2d. Cir. 1997).

Given that in many cases the defendants will have had a longer association with the witness than the government has, it is wise to question the witness at length about the information the defendant may have that may discredit him or her. Assistants should also speak with the agents and officers about their knowledge of the witness and his or her problems and about any material that may be in the agency or department files about the witness, including but not limited to any pending charges, witness statements, etc.

If the cooperating witness is incarcerated, he or she should be cautioned about what they say over prison telephones. Defense counsel may seek the tapes of cooperators' conversations in an effort to obtain valuable impeachment evidence. All cooperating witnesses should be cautioned to be careful when they speak to others about the subject matter of their testimony.

Alert them to the names of their law enforcement contacts; if others contact them about the case, the witness should assume such persons are associated with the defense. Since no cooperator or witness may ever be told by a government representative that they may not communicate with defense counsel or an investigator, it must be made clear to the cooperator or witness that it is his or her decision to be made with consultation of their counsel, whether to speak to defense counsel or a defense investigator.

Cooperating prisoner witnesses present other special concerns. There are limited facilities in and around this District where prisoners can be housed – thus, an Assistant cannot promise a prisoner that he will not encounter someone he or she has cooperated against or someone who knows about his cooperation. But we can and must take steps to maximize a cooperating prisoner's safety.

If the prisoner is in the custody of the United States Marshal, an Assistant should provide the Marshals with a written request that the prisoner be separated from specified other prisoners. *See* Defendant Separation Notice. Work with the Marshals to the extent possible to have cooperating prisoners placed in a different facility than non-cooperating defendants. When an Assistant requests the presence of a cooperating prisoner for court, grand jury, or an interview, he or she should consider what other prisoners may be brought in that day. The Marshals should be told about the security concern so that they can take steps to maintain the separation between the cooperating prisoners and other prisoners who may be in the courthouse the same day.

If the prisoner is in the custody of the Bureau of Prisons, the Assistant must notify BOP in writing of any people from whom the prisoner must be separated and the reason for the separation (cooperation against the specified persons, threats to the cooperator by a specified person, etc.) *See* U.S.A.M. § 9-21.600. The separation request must be specific about the reason and about the identities of the prisoners. BOP should be given as much identifying information (name, date of birth, prisoner number) as the Assistant and agent has. BOP places a higher priority on separation requests that are specific about the reason.

Occasionally, the government may want to use a cooperating prisoner in a proactive investigation. If the prisoner is in federal custody as a pre-trial detainee or a sentenced prisoner, OEO approval is required to use the prisoner. *See* U.S.A.M. § 9-21.050. Such approval is not required if the government seeks to use a prisoner prior to his or her initial appearance. Should an Assistant or an agent wish to have a defendant currently under the court's supervision (*e.g.* probation or supervised release) cooperate with law enforcement in a proactive investigation, an Assistant will first need to seek and receive the court's permission.

For further discussion of issues that arise with cooperating witnesses, refer to Chapter Four, Part J. of this Manual which discusses trial preparation.

### b.      Law Enforcement Witnesses

Under Supreme Court and other precedent, *see Kyles v. Whitley*, 514 U.S. 419 (1995), prosecutors are deemed to have knowledge of all material in the files of the agencies and police departments that have participated in the investigation. Such material includes the personnel files of the agents and police officers who are prospective government witnesses. In order to comply with our *Brady/Giglio* obligations in this regard, the Office instituted a policy that seeks the review of personnel and other law enforcement files that may bear upon the credibility of law enforcement witnesses.

A *Giglio* check must be timely conducted for all law enforcement officers, agents, and personnel who are potential government witnesses. Once, an Assistant identifies law enforcement witnesses in a particular matter or case, the Assistant forwards the list of such witnesses to the office's *Giglio* Coordinator. The Coordinator then sends a written request to the agencies or departments that employ the prospective witnesses, asking for a review of the witnesses' personnel files. If the files contain information that may bear on the credibility of the prospective law enforcement witness, that information is forwarded to the *Giglio* Coordinator. If the witness is expected to testify and the disclosed file material may bear on the witness's credibility, the Coordinator will disclose it to the Assistant on the case. The Assistant must discuss with the *Giglio* Coordinator whether the disclosed material warrants disclosure. If the impeachment value of the file material is clear, the Assistant will disclose it to the defense, with prior notice made to the law enforcement witness. If the impeachment value is unclear, the Assistant will make an *ex parte* disclosure to the presiding judge, under seal, seeking the court's determination whether the personnel file material must be disclosed to the defense. If the file information is not disclosed, it is kept confidential, in the custody of the *Giglio* Coordinator. It should *not* be kept in the case file at the close of a case.

A copy of any *ex parte* submissions made to a court and the ruling of the court regarding disclosure should be forwarded to the *Giglio* Coordinator.

Assistants are encouraged to forward the names of prospective law enforcement witnesses to the *Giglio* Coordinator as early as possible during the investigation of the case. If an agent or officer has a serious disciplinary problem that would discredit him or her on the stand, the Assistant will want to have notice of the problem early in the case. Before preparing search warrants or Title III affidavits, for example, the Assistant would be wise to consult the *Giglio* Coordinator about the proposed affiant. Further, the Assistant must talk directly to the agents and officers involved in the investigation about their disciplinary record and any impeachment material that may exist. Although you have sought a *Giglio* check of an agent's personnel file prior to the return of charges in a case, you will need to renew the request prior to trial if you intend to call the agent as a trial witness. Such a practice can avoid the problem of an agent having a personnel issue after your initial check but prior to your trial.

The agencies and departments who work with this Office are willing to comply with our requests for file review because they trust us to keep these matters confidential unless or until disclosure must be made to the court or the defense. Consequently, it is important that the contents of personnel files disclosed to Assistants remain confidential and not be discussed openly within or outside the office.

On occasion, Assistants in this office handle criminal investigation of members of law enforcement, including agents or officers who have worked with Assistants in this Office. Assistants handling those sensitive investigations need to work closely with the *Giglio* Coordinator so as to ensure that the Office meets its discovery obligations under *Giglio*.

In the event that we receive information that may need to be disclosed to the court or to the defense, the *Giglio* Coordinator can work with you on any disclosures and can provide sample filings that may be helpful.

### 4.    Use of Discovery Letters and Disclosure of Documents

One of the most important steps in the discovery process is keeping good records regarding disclosures. Assistants must make a record of when and how information is disclosed or otherwise made available. The initial discovery disclosure must be accompanied by the office's standard discovery letter which tracks the provisions of the Standing Order. If possible, the Assistant must keep a copy of everything provided to the defense or identify with specificity in the discovery letter the material provided so that there is some record of what was disclosed and when. The form discovery letter contains the requisite notice language that triggers the defendant's discovery obligations under Rules 16 and 12.1-12.3. Additional disclosures must be accompanied by a letter or email documenting what was provided to defense counsel.

Assistants should never give the defense custody of any original document or other evidence. If the defense wants to see original evidence, such evidence can be made available for inspection at this Office or at the agency's office with an agent present. Assistants should never seek to discourage defense counsel from reviewing certain discovery by suggesting in any manner that the materials are not helpful or relevant or that the materials do not contain exculpatory information.

Assistants are encouraged to produce documents in electronic format on a CD rom after the documents have been electronically bates stamped. If the defendant has retained counsel, he or she is responsible for the costs of copying discovery materials. The standard arrangement if this Office does the copying is no per page charge for the first 50 pages, $.10 per page for every page thereafter, plus reimbursement for copying time at a rate of $4.00 per quarter hour. If the defendant has appointed counsel, there is no charge for the copying of discovery.